**WARD, KEENAN & BARRETT, P.C.**
Gerald Barrett, SBN 5855
3838 N. Central Avenue, Suite 1720
Phoenix, Arizona 85012
Telephone: (602) 279-1717
Facsimile: (602) 279-8908
gbarrett@wardkeenanbarrett.com

**LEVI & KORSINSKY LLP**
Elizabeth K. Tripodi
Donald J. Enright
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4291
Facsimile: (202) 333-2121
etripodi@zlk.com
denright@zlk.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| GAYLEN A. PETERSON, *on behalf of herself and all others similarly situated*,<br><br>　　　　　　Plaintiff,<br>　　　vs.<br><br>SWIFT TRANSPORTATION COMPANY, RICHARD H. DOZER, GLENN BROWN, JOSÉ CÁRDENAS, JERRY MOYES, WILLIAM RILEY III, and DAVID VANDER PLOEG<br><br>　　　　　　Defendants. | Civil Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

### CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Gaylen A. Peterson ("Plaintiff"), on behalf of herself and the proposed Class defined herein, brings this class action suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this Class Action Complaint, Plaintiff, by her

attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of herself and the public stockholders of Swift Transportation Company ("Swift" or the "Company") against the Company and Swift's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On April 9, 2017, the Company entered into an Agreement and Plan of Merger ("Merger Agreement") pursuant to which Swift and Bishop Merger Sub, Inc. ("Merger Sub") will be combined with Knight Transportation, Inc. ("Knight") (the "Proposed Transaction").

3.      Under the terms of the Merger Agreement, Swift will amend its certificate of incorporation to permit the Company to convert all outstanding Class B shares of Swift into an equal number of shares of Class A shares of Swift. Thereafter, all out outstanding Class A shares of Swift will be combined by means of a reverse stock split into 0.720 of a Class A shares of the combined company (the "Reverse Stock Split"). Merger Sub, a direct wholly-owned subsidiary of Swift, will merge with and into Knight, with Knight becoming a wholly-owned subsidiary of the combined company. Each share of Knight will be exchanged for one Knight-Swift share. The combined company will be publicly owned and will trade its stock on New York Stock Exchange under the symbol KNX, with Swift changing its name to Knight-Swift Transportation Holdings Inc. Following the completion of the merger, Swift shareholders will own 54% of the new company, while Knight shareholders will own the rest.

4.      On May 24, 2017, defendants issued materially incomplete and misleading disclosures in the Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Registration Statement is deficient and misleading in that it fails to provide adequate disclosures of all material information related to the Proposed Transaction.

5.      Accordingly, Plaintiff alleges herein that Defendants have breached their

fiduciary duties and violated Sections 14(a) and 20(a) of the Exchange Act in connection with the filing of the Registration Statement. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

7.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

9.     Plaintiff is, and has been at all relevant times, the owner of shares of Swift common stock.

10.     Defendant Richard H. Dozer ("Dozer") has served as a director of Swift since April 2008. He is presently serving as Chairman of the Board, Chairman of the Audit Committee, a member of the Compensation Committee, and member of the Nominating and Corporate Governance Committee.

11.     Defendant Glenn Brown ("Brown") has served as a member of the Company's Board since 2010. Brown currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and Compensation

Committee.

12.     Defendant José Cárdenas ("Cárdenas") served as a member of the Company's board of directors since July 2014.

13.     Defendant Jerry Moyes ("Moyes") served as Swift's CEO from May 2007 until his retirement effective December 31, 2016. Moyes currently serves as a consultant to the Company with the title Founder and Chairman Emeritus.

14.     Defendant William Riley III ("Riley") has served as a director of Swift since July 2014.

15.     Defendant Defendant David Vander Ploeg ("Vander Ploeg") has served as a director of Swift since September 2009. Vander Ploeg is the Chair of the Compensation Committee and serves as a member of the Audit Committee and Nominating and Governance Committee.

16.     Defendants Vander Ploeg, Riley, Moyes, Cárdenas, Brown, and Dozer are collectively referred to herein as the "Board" or the "Individual Defendants."

17.     Defendant Swift Transportation Company is an Arizona-based publicly held American truckload motor shipping carrier. The Company is the largest common carrier in the United States, with over 16,000 trucks. The Company is a Delaware corporation and maintains its principal offices at 2200 South 75th Avenue, Phoenix, Arizona 85043. Swift's common stock is traded on the NYSE under the ticker symbol "SWFT."

18.     The Individual Defendants and Swift are referred to collectively herein as "Defendants."

**OTHER RELEVANT ENTITIES**

19.     Knight is a publicly traded Phoenix, Arizona, based American truckload motor shipping carrier.

20.     Merger Sub, an Arizona corporation, is a wholly-owned subsidiary of Swift and was formed solely for the purpose of carrying out the merger.

**CLASS ACTION ALLEGATIONS**

21.     Plaintiff brings this action individually and as a class action on behalf of all

holders of Swift stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

22.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

23.     The Class is so numerous that joinder of all members is impracticable. According to the Form 10-Q Quarterly Report filed with the SEC on May 2, 2017, as of April 25, 2017, there were 83,539,116 shares of Swift class A common stock and 49,741,938 shares of Swift class B common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

24.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

(a)     Whether defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable harm were the Proposed Transaction consummated.

25.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

26.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

28.     Plaintiff anticipates that there will be no difficulty in the management of this

litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

29.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

30.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of herself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FACTUAL BACKGROUND

### Company Background and Strong Financial Outlook

31.     Co-founded in 1966 by Defendant Moyes, Swift has grown to become the largest full-truckload motor carrier in North America, generating over $4 billion in revenue and operating nearly 20,000 trucks. As of December 2016, Swift's fleet was comprised of 13,937 Company tractors and 4,429 owner-operator tractors, as well as 64,066 trailers, and 9,131 intermodal containers.

32.     Helping to fuel this success is the Company's Code of Business Conduct (the "Code"), a central tenant of Swift's corporate culture, which provides principles to which Swift's employees, officers, and board members are expected to adhere. Included as part of these principles, is the mandate that all employees be held to the highest standards of veracity. This adherence to honesty is also applied to dealings with the Company shareholders, as the Code mandates that the Company provide shareholders with full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the SEC and in other public communications made by the registrant. Here, the Company has violated this requirement by including materially incomplete and misleading disclosures in the Form S-4 Registration Statement filed with the SEC in connection with the Proposed Transaction.

### The Sale Process

33.     Knight and Swift, the two largest truckload companies in Phoenix, Arizona, have long-standing familiarity with each other's businesses and have informally discussed a possible

6

business combination at various points over the past several years. However, it wasn't until the fall of 2016 that these informal discussions became reality.

34.     On August 30, 2016, Kevin Knight, Executive Chairman of the board of directors of Knight, met with Defendant Moyes and conveyed Knight's interest in combining Knight and Swift.

35.     Knight's interest in a potential merger was first shared with Defendant Dozer in late August 2016, before eventually being presented to the entire Board during a September 7, 2016 board meeting. Following the September 7 meeting, the Board directed management to proceed regarding a potential combination with Knight, and discussions between the two companies began in earnest.

36.     On the morning of September 23, 2016, Defendants Dozer and Moyes met with Messrs. Kevin and Gary Knight to discuss the strategic rationale for a combination of Knight and Swift, including the potential management team of the combined company. No proposal was made at this meeting and the parties did not discuss any financial terms of a potential transaction. Three days later Defendant Dozer met with Messrs. Knight to further discuss potential terms of a combination, including the potential management team of a combined company.

37.     That same day, the Swift board of directors held a meeting to discuss the potential transaction with Knight, including the engagement of legal and financial advisors to assist with Swift's evaluation of a potential transaction. At this meeting, the Board authorized the engagement of Kirkland & Ellis LLP ("Kirkland"), as counsel to Swift in connection with the evaluation of a potential transaction with Knight, and the Board determined to interview investment banks at a later date in order to select a financial advisor.

38.     On October 4, 2016, Knight's representatives sent Swift a draft mutual nondisclosure agreement (the "NDA"), which was reviewed by Swift's board of directors during an October 5, 2016 meeting of the Swift board of directors. At the conclusion of the meeting, the Board directed its representatives to continue negotiating the terms of the NDA and scheduled a meeting in Phoenix later in October to interview potential financial advisors.

39.     The interviews occurred on October 27, 2016. Defendants Dozer, Moyes, Riley,

7

and Vander Ploeg, members of Swift management, and representatives of Kirkland met with three investment banks and discussed the potential engagement of a financial advisor in connection with a range of potential strategic transactions involving Swift and the investment banks' respective qualifications, reputations and experience.

40.     During a November 3, 2016 board meeting, the Board discussed the previous week's investment bank interviews, and concluded that it would not make a decision to engage a financial advisor until a proposal was received from Knight. Additionally, the Board concluded that, in light of the significant additional work associated with the evaluation of the potential transaction, additional compensation was warranted. The Registration Statement fails to provide specific details regarding why the Board believed that this additional work was outside their responsibilities as Board members thereby justifying additional compensation. Furthermore, although additional compensation was initially discussed to be paid on a per meeting basis, the Registration Statement indicates that the Board agreed to pay themselves additional compensation as follows: (i) $500 for one hour or less; (ii) $1,000 for one to four hours; and (iii) $2,500 for four hours or more. The Registration Statement fails to disclose the total amount that was paid out to individual board members under this arrangement.

41.     On November 28, 2016, Knight sent a draft indication of interest to Defendant Dozer, which contemplated (1) an all-stock transaction in which each class A share of Swift and class B share of Swift would be exchanged for 0.740 of a share of the combined company, and each share of Knight would be exchanged for one combined company share; (2) that the combined company would include a number of Swift directors to be mutually agreed upon, but the combined company's board of directors would have a majority of its directors comprised of current directors of Knight; (3) that some of Swift's key executive officers and operating team members would continue to hold leadership roles over Swift's business after closing; (4) that both companies would continue to operate as distinct businesses with separate brands; and (5) that the new name of the combined company would include both the "Knight" and "Swift" names.

42.     The indication of interest was presented to the Board on December 1, 2016. Given

the importance of any decision regarding the indication of interest and to provide sufficient time for the Board to review the proposal, the Board determined that it would further discuss these matters at the next quarterly meeting on December 22, 2016. To assist in this process, the Board approved the selection of Morgan Stanley as the Company's financial advisor, and agreed that Morgan Stanley would provide its preliminary financial analysis relating to the indication of interest at the meeting on December 22, 2016.

43.     At the December 22, 2016 quarterly board meeting, the Board received an update pertaining to the status of discussions with Knight. After presentations from both Kirkland and Morgan Stanley, the Board concluded that Defendant Dozer would communicate to Kevin Knight that, Swift was willing to sign a nondisclosure agreement, exchange financial projections, provide Knight with the targeted due diligence items noted in the Initial Proposal and engage in discussions regarding potential synergies. During this meeting, Morgan Stanley presented to the Swift board of directors a relationship disclosure letter, which had been previously circulated to the Swift board of directors, noting in particular that in the past two years Morgan Stanley, or an affiliate thereof, had been engaged as a lender to Defendant Moyes, as well as Keith Knight, a former executive of both Swift and Knight. The Registration Statement, does not disclose the timing and compensation Morgan Stanley earned for the lending services to each of Moyes and Keith Knight.

44.     Between January 6, 2017 and January 16, 2017, Swift and Knight, and their respective representatives, negotiated the terms of a mutual NDA containing reciprocal standstill obligations (and which permitted each party to privately submit one or more acquisition proposals to the other party's chairman or board of directors). The NDA was executed on January 16, 2017.

45.     Over the next month, due diligence continued, and members of Swift's management met with representatives of Knight to discuss the potential roles of Swift management in the combined company.

46.     On February 28, 2017, the Board held a special meeting to review the status of the potential transaction with Knight. During this meeting, Defendant Moyes informed the Board

that he would not support any strategic transaction involving Swift other than a combination with Knight. As Moyes, along with certain of his family members and affiliates, beneficially own approximately 45% of Swift's class A and B shares, Moyes' support was necessary for the successful completion of any proposed strategic transaction.

47.    Negotiations and due diligence between the two companies continued unabated throughout the early-half of March, and on March 14, 2017, Knight submitted a revised indication of interest. This revised indication of interest contemplated (1) a 0.675 exchange ratio; (ii) that Swift would remain as the surviving public company, (iii) that the combined company would have a single class of shares outstanding, (iv) that the combined company's board would consist of 10 to 15 directors, with two directors to be selected by the Swift board of directors and two directors to be selected by Defendant Moyes in his capacity as a stockholder, and (v) that Defendant Moyes and members of his family would be subject to obligations to vote in favor of a transaction as well as standstill provisions and transfer restrictions with respect to the combined company and Mr. Moyes would have certain governance rights with respect to the combined company.

48.    The Board reviewed this updated proposal on March 16, 2017, and concluded that, while the Company was willing to continue exploring a transaction with Knight, the exchange ratio would need to be increased. This information was communicated to Knight on March 18, 2017.

49.    On March 19, 2017, Gary Knight informed Defendant Dozer that Knight was willing to increase the exchange ratio to 0.70, and that Knight's improved proposal was conditioned on Swift not soliciting or entertaining alternative transactions. Following further negotiations, the exchange ratio was later increased to .72 on March 21, 2017.

50.    That same day, the Board met and, after reviewing the recent negotiations between the two Companies and their respective representatives, determined to move forward with discussions based on an exchange ratio of 0.72.

51.    From March 22 through April 9, due diligence and negotiations between Knight and Swift, and their respective representatives, continued as the parties exchanged drafts of the

merger agreement and continued to negotiate business and legal issues in the merger agreement, including the voting and fiduciary provisions. As part of these negotiations, on March 31, 2017, Knight requested that Defendants Dozer and Vander Ploeg serve on the combined company board.

52.     On April 9, 2017, following the finalization of the Merger Agreement, the Board held a meeting to vote on the Proposed Transaction. After a review of the Merger Agreement and a presentation by Morgan Stanley of its financial analysis of the proposed transaction, the Board unanimously determined: that that the merger and the merger agreement and the transactions contemplated thereby, including the Swift charter amendment and the Swift share issuance, were advisable and in the best interests of Swift and its stockholders; unanimously approved and adopted the merger agreement; authorized management to execute the merger agreement on behalf of Swift; directed that the Swift charter amendment and Swift share issuance be submitted to a vote at a meeting of Swift stockholders; resolved to recommend that Swift stockholders vote to approve the Swift charter amendment and the Swift share issuance; and approved and authorized certain related matters, including the support agreements and stockholders agreements.

53.     The following day, the parties issued a joint press release announcing the merger.

**The Proposed Transaction**

54.     In a joint press release dated April 10, 2017, Knight and Swift announced that they had entered into the Merger Agreement pursuant to which Knight will merge with a wholly owned subsidiary of Swift in an all-stock transaction, thereby forming the combined company Knight-Swift Transportation Holdings Inc.

55.     The press release states in pertinent part:

PHOENIX--(BUSINESS WIRE)--Knight Transportation, Inc. (NYSE:KNX) ("Knight") and Swift Transportation Company (NYSE:SWFT) ("Swift") today announced that their boards of directors have unanimously approved a merger of Knight and Swift in an all-stock transaction that will create the industry's largest full truckload company. The combined company will be named Knight-Swift Transportation Holdings Inc. ("Knight-Swift") and will trade under the ticker "KNX."

This transaction combines under common ownership two long-standing industry leaders creating North America's premier truckload transportation company with $5 billion in annual revenue and a "Top 5" truckload presence in dry van, refrigerated, dedicated, cross-border Mexico and Canada, and a significant presence in brokerage and intermodal. The holding company structure will enable the Knight and Swift businesses to operate under common ownership and share best practices, while maintaining distinct brands and operations. The company will remain headquartered in Phoenix, Arizona operating with approximately 23,000 tractors, 77,000 trailers, and 28,000 employees.

Under the terms of the definitive agreement each Swift share will convert into 0.72 shares of Knight-Swift by means of a reverse stock split. Each share of Knight will be exchanged for one Knight-Swift share. Based on the $30.65 closing price of Knight shares on April 7, 2017, the last trading day prior to the announcement, the implied value per share of Swift is $22.07. Upon closing of the transaction, Swift stockholders will own approximately 54 percent and Knight stockholders will own approximately 46 percent of the combined company. Based on Knight's closing share price on April 7, 2017, the number of combined company shares expected to be outstanding after closing and the combined net debt of Swift and Knight as of December 31, 2016, the combined company would have an implied enterprise value of approximately $6 billion.

Knight is expected to be the accounting acquirer, and the transaction is expected to be accretive to adjusted earnings per share ("Adjusted EPS") with expected pre-tax synergies of approximately $15 million in the second half of 2017, $100 million in 2018, and $150 million in 2019.

Knight Executive Chairman, Kevin Knight, said: "In Knight's 26-year history, we have built a truckload company with industry leading margins and investment returns. When the two companies began discussions, we had four goals in mind: create a company with the best strategic position in our industry; identify significant realizable synergies that would create value for both sets of stockholders; create a business that over the long-term will operate at Knight's historical margins and financial returns; and agree on a leadership and corporate governance framework that will benefit all stakeholders. I am confident we have achieved those goals."

Swift Chairman, Richard Dozer, stated: "This is a terrific opportunity for our stockholders, who stand to benefit from the significant upside potential of this transaction. Indeed, by coming together under common ownership, the companies will be able to capitalize on economies of scale to achieve substantial synergies. This is an exciting chapter in the Swift story and everyone who is a part of it should be both proud of what we bring to the table and excited about what lies ahead. I am confident in this new team, in the new structure and in the future of Swift in the industry."

Knight Chief Executive Officer, Dave Jackson, added: "Under this ownership structure, we will be able to operate our distinct brands independently with experienced leadership in place. We look forward to learning from each other's

best practices as we seek to be the most efficient company in the industry. We are dedicated to a seamless transition and ensuring continuity for our customers and professional Driving Associates."

Swift Chief Executive Officer, Richard Stocking, stated: "I am proud of all Swift has accomplished and that it will be a significant part of this new venture, which brings together the most robust, respected and reliable truckload providers in North America. I am especially proud of the fact that both companies will remain devoted to delivering a better life to employees, customers, and communities. Throughout this transition, I encourage everyone to work together to continue building the Swift brand."

Swift founder and controlling stockholder, Jerry Moyes, added: "I cannot think of a better combination. The Knight and Moyes families grew up together, and the Knights helped me build Swift before starting their own company and making it an industry leader in growth and profitability. I am confident that we have the right approach to maximizing the contribution of both teams, and I look forward to helping the Knight-Swift leadership team in any way I can to continue the legacy of both great companies."

**Outlook and Synergy Opportunities**

Knight has been among the most efficient truckload motor carriers and Knight-Swift expects to employ a cross-functional team to generate significant synergies across both brands. The transaction is expected to be accretive to adjusted earnings per share and to generate pre-tax revenue and cost synergies of approximately $15 million in the second half of 2017, $100 million in 2018 and $150 million in 2019. Synergies are expected to be realized from sharing best practices from each company, improving yield, identifying purchasing economies, benefitting from broader geographic scale and capitalizing on an enhanced cash flow profile to reduce interest costs.

**Preliminary Combined Financial Information (1)**

On a combined basis, Knight and Swift generated approximately $5.1 billion in total revenue, $416 million in adjusted operating income and $806 million in Adjusted EBITDA for 2016. The combined financial information excludes synergies, transaction and related expenses, and transaction accounting, including amortization of intangibles.

On a combined basis, as of December 31, 2016, net debt was approximately $1.1 billion, and Knight-Swift's leverage ratio (net debt/Adjusted EBITDA) was approximately 1.3x. The Swift credit facilities are not required to be refinanced in connection with the closing but may be refinanced in the future on more attractive terms. Post-closing, Knight-Swift expects to pay its stockholders quarterly dividends of $0.06 per share. On a combined basis, free cash flow was approximately $495 million for 2016. The companies expect net capital expenditures to be approximately $345 million to $410 million for the full year 2017.

**Leadership and Corporate Governance**

The Board of Directors of Knight-Swift will comprise all Knight directors and four current Swift directors. The Jerry Moyes family will initially be entitled to designate two directors reasonably acceptable to the Board, one of whom must be independent, with the initial designees being Glenn Brown and Jerry Moyes. The remaining two directors were chosen by the Swift board and will be Richard Dozer and David Vander Ploeg. Kevin Knight will serve as Executive Chairman of the Board and Gary Knight will serve as Vice Chairman.

The executive team of Knight-Swift will be led by Kevin Knight as Executive Chairman, Dave Jackson as Chief Executive Officer and Adam Miller as Chief Financial Officer. Following the close of the transaction, Kevin Knight will serve as President of the Swift operating entities. Jerry Moyes will serve as a non-employee senior advisor to Kevin and Gary Knight.

Richard Stocking, Chief Executive Officer of Swift, and Ginnie Henkels, Chief Financial Officer of Swift, have chosen to pursue other opportunities following the closing of the transaction. In the interim, both Mr. Stocking and Ms. Henkels will continue to lead Swift to ensure a smooth transition.

Knight-Swift will have a single class of stock outstanding with one vote per share. In the transaction, Swift's existing Class B common stock with two votes per share held by members of the Jerry Moyes family will be converted on a one-for-one basis into Class A common stock. Those shares, like all other Class A shares of Swift, will convert into 0.72 shares of Knight-Swift and there will be no shares of Class B common stock outstanding following the close of the transaction. After giving effect to the transaction, the Jerry Moyes family will beneficially own approximately 24 percent of the Knight-Swift stock and has agreed that any shares they are entitled to vote in excess of 12.5 percent of the combined company's shares will be voted as directed by a committee comprising Jerry Moyes, Kevin Knight and Gary Knight, except in the case of a vote of any sale of Knight-Swift. In addition, the Jerry Moyes family has agreed to certain standstill restrictions and provisions designed so that any share sales by the Jerry Moyes family are implemented in an orderly manner. Certain members of the Knight family have also agreed to such restrictions.

**Approvals and Close**

The transaction is subject to customary conditions, including the approval of the stockholders of Knight and Swift, as well as antitrust approvals. The Jerry Moyes family, which holds approximately 56 percent of the Swift voting power, and Kevin Knight and Gary Knight, who hold approximately 10 percent of the Knight voting power, have agreed to vote their shares in favor of the transaction.

Following the close of the transaction, which is expected to occur in the third quarter of 2017, Knight-Swift is expected to have approximately 176.1 million shares outstanding and 178.9 million shares on a fully diluted basis. The Knight-

14

Swift shares are expected to trade on the New York Stock Exchange under the symbol "KNX."

## The Registration Statement Contains Numerous Material Misstatements or Omissions

56.     On May 24, 2017, Defendants filed, or caused to be filed, a materially incomplete and misleading Registration Statement with the SEC and disseminated it to Swift stockholders. The Registration Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

57.     Specifically, as set forth below, the Registration Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the Company's financial projections; (ii) potential conflicts of interest concerning the Company's directors.; and (iii) potential conflicts of interest involving Morgan Stanley. Accordingly, Swift stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

### *Material Omissions Concerning Insiders' Potential Conflicts of Interest*

58.     The Registration Statement fails to disclose material information concerning the potential conflicts of interest faced by Swift's Board.

59.     The Registration Statement indicates that the Board agreed to pay themselves "on a per meeting basis," for evaluating the Proposed Transaction as well as additional compensation as follows: (i) $500 for one hour or less; (ii) $1,000 for one to four hours; and (iii) $2,500 for four hours or more. No further details are provided regarding the amount of compensation each Board member received in connection with their consideration of the Proposed Transaction.

60.     Furthermore, following the close of the Proposed Transaction, certain members of Swift's Board will continue with the new company, and receive a variety of benefits. However, the Registration Statement fails to fully disclose the timing and nature of all communications regarding future employment and/or benefits relating to Swift's management and directors, including who participated in such communications and when Knight first expressed its interest

in retaining members of Swift management following the merger. Additionally, the Registration Statement is silent as to whether the Board ever considered creating a special committee of independent directors to consider the Proposed Transaction in light of Defendant Moyes's controlling interest and the active participation of Defendant Dozer in the negotiation process.

61.     Communications regarding post-transaction employment opportunities during the negotiation of the underlying transaction must be fully disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders. Additionally, information regarding Board compensation and the Board's view towards the creation of a Special Committee is necessary for stockholders to understand potential conflicts of interest of the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

62.     The omission of this information renders certain portions of the Registration Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Transaction" and (ii) "Interests of Swift's Directors and Officers in the Transaction."

***Material Omissions Concerning Conflicts of Interest Involving Morgan Stanley***

63.     The Registration Statement fails to disclose material information concerning the potential conflicts of interest faced by Morgan Stanley.

64.     As noted in the Registration Statement, Morgan Stanley or an affiliate thereof currently is a lender to Moyes and to Keith Knight. No details are provided the amount of compensation Morgan Stanley has earned, or is expected to earn, in connection with those services.

65.     Full disclosure of investment banker compensation and all potential conflicts is necessary due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives. Accordingly, the omission of such

conflicts of interests renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Transaction" and (ii) "Opinion of Swift's Financial Advisor."

### *Material Omissions Concerning the Company's Financial Projections*

66.     Additionally, the Registration Statement also fails to disclose material information concerning the Company's financial projections. Specifically, the Registration Statement provides stockholders with three sets of certain of the Company's financial projections: (i) Swift December standalone projections; (ii) Swift December upside standalone projections; and (iii) Swift April standalone projections.  Included as part of these projections are values for a number of non-GAAP financial measures including EBITDA, Adjusted Net Income, Adjusted EPS, and Unlevered Free Cash Flow. Although the Registration Statement provides a definition for how these metrics were calculated, it fails to provide the line item metrics used to calculate them. Providing these non-GAAP metrics without disclosing the line item metrics used to calculate it, or otherwise reconciling the non-GAAP projection to GAAP measures, makes the provided disclosure materially incomplete and misleading. Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.

67.     Accordingly, the Registration Statement provides Swift stockholders with non-GAAP financial projections that make it extremely difficult for stockholders to assess the fairness of the Proposed Transaction.  Because of the non-standardized and potentially manipulative nature of non-GAAP measures, the SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses information in a Registration Statement that includes a non-GAAP financial measures, as is the case here, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

68.     Item 10(e)(1)(i)(B) of SEC Regulation S-K further states that, with regard to forward-looking information such as financial projections, *any* reconciling metrics that are available without unreasonable efforts must be disclosed.   17 C.F.R. 229.10(e)(1)(i)(B).

Moreover, on May 17, 2016, the SEC's Division of Corporation Finance released updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures.  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide reconciling metrics for "free cash flow" figures.   S.E.C.   Comp.   &   Disc.   Interps.,   Question   102.07   (May   17,   2016) https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

69.    EBITDA, Adjusted Net Income, Adjusted EPS, and Unlevered Free Cash Flow share similar line item metrics, and for that reason it is disconcerting that the information required to calculate and reconcile the most directly comparable GAAP financial measure is described in the Registration Statement as being unavailable without unreasonable efforts. As discussed in the *Swift Management's Unaudited Prospective Financial Information* section, these shared metrics, and others, were used by management to calculate the projections for 2017 through 2021. Consequently, this information is readily available to management and should be shared with stockholders. The failure to do so places Swift stockholders at a significant disadvantage. Accordingly, without the ability to reconcile the non-GAAP projections to corresponding GAAP metrics, Swift's stockholders are provided an incomplete picture of the Company's financial future and are therefore unable to make a fully informed decision on whether or not to tender their shares.

70.    Without disclosure of these reconciling metrics, the Registration Statement violates SEC regulations and materially misleads Swift's stockholders. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Furthermore, disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Here, the Defendants' failure to provide full and accurate disclosures renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:

(i) "*Swift Management's Unaudited Prospective Financial Information*" and (ii) "*Opinion of Swift's Financial Advisor.*"

71. Accordingly, based on the foregoing disclosure deficiencies in the Registration Statement, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will suffer, absent judicial intervention, if Swift's stockholders are required to vote on the Proposed Transaction without the above-referenced material misstatements and omissions being remedied.

### FIRST CAUSE OF ACTION
**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

72. Plaintiff repeats and realleges each allegation set forth herein.

73. As detailed herein, Defendants disseminated the false and misleading Registration Statement specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

74. By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common stock of Swift.

75. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Registration Statement. The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. The Registration Statement misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Registration Statement with

19

these materially false and misleading statements and omissions. Defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

76. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

77. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION
### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

78. Plaintiff repeats and realleges each allegation set forth herein.

79. The Individual Defendants acted as controlling persons of Swift within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of Swift and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

80. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

81. In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Registration Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

82.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

83.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

84.    Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as a representative of the Class, and appointing his counsel as class counsel;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders;

C.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated:  June 29, 2017

**OF COUNSEL:**                              s/Gerald Barrett_____
                                            Gerald Barrett, SBN 5855
Elizabeth K. Tripodi                        WARD, KEENAN & BARRETT, P.C.
Donald J. Enright                           3838 N. Central Avenue, Suite 1720
LEVI & KORSINSKY LLP                        Phoenix, Arizona  85012
1101 30th Street, NW, Suite 115             Telephone:  (602) 279-1717
Washington, DC  20007                       Facsimile:  (602) 279-8908 (fax)
Telephone:  (202) 524-4291                  gbarrett@wardkeenanbarrett.com
Facsimile:  (202) 333-2121

                                            *Attorneys for Plaintiff*

22